**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Scott Douglas Nordstrom, | CV-15-02176-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Charles L. Ryan, et al., | |
| Defendants. | |

Plaintiff Scott Douglas Nordstrom, a death-sentenced inmate in state custody, brought an action pursuant to 42 U.S.C. § 1983 against Defendant Charles L. Ryan, Director of the Arizona Department of Corrections ("ADOC"), and others (collectively, "Defendant"). Doc. 1. The parties settled, and the Court dismissed the action. Docs. 39; 45. Plaintiff moves to enforce the settlement agreement. Doc. 64. No party requests oral argument. For the following reasons, the Court will deny Plaintiff's motion.

**I. Background.**

When Plaintiff filed his complaint in this action in October 2015, ADOC policy required death-sentenced inmates to be housed in maximum-security facilities, often referred to as "death row." Doc. 1 at 2-3. Plaintiff was housed at the Arizona State Prison Complex ("ASPC"), Eyman, Browning Unit, and he alleged that death row conditions were significantly worse than general population conditions and maximum-security facilities for non-death-sentenced prisoners. *Id.* at 2. He asserted violations of the Eighth and Fourteenth Amendments related to death row conditions, including solitary confinement in

small, constantly illuminated cells; poor sanitation; a total bar on contact visits; restricted recreation and exercise; limited employment opportunities; and no opportunity to participate in communal meals and group religious services. *Id.* at 2, 6-10, 13-14.

Having already planned to make death row inmates eligible for reclassification to close-custody housing, ADOC settled with Plaintiff on March 3, 2017 ("the Settlement"). Docs. 66 at 2; 39. In part, the Settlement provided that

> [ADOC would] eliminate the existing permanent classification of inmates with a death sentence to maximum custody units, and [] permit death row inmates to seek and obtain re-classification to close custody status based on the criteria currently available to non-death sentenced maximum custody inmates[;]
>
> * * *
>
> [The] conditions and restrictions of confinement, and quality of facilities, utilized for close custody housing for death sentenced inmates [would] be equivalent to that of existing close custody housing facilities used for non-death sentenced inmates.

Doc. 39 at 2 ¶¶ 1, 3. The parties stipulated to dismissal under this agreement, and the Court dismissed the action, incorporated the Settlement terms in its order, and retained jurisdiction to enforce the agreement. Doc. 45.

Based on his disciplinary record, Plaintiff was eligible for reclassification and he eventually was transferred to close-custody housing at ASPC-Florence, Central Unit ("Central Unit"), in July 2017, along with other reclassified death-sentenced inmates. Docs. 39 at 3; 64 at 3. Central Unit is a close-custody facility and currently houses 721 non-death-sentenced and 82 death-sentenced inmates. Doc. 66-1 at 3.

**I.  Jurisdiction.**

"In general, '[e]nforcement of [a] settlement agreement . . . whether through award of damages or decree of specific performance, is more than just a continuation or renewal of the dismissed suit, and hence requires its own basis for jurisdiction.'" *Alvarado v. Table Mountain Racheria*, 508 F.3d 1008, 1017 (9th Cir. 2007) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994)). But "a federal court has jurisdiction to

enforce a settlement agreement in a dismissed case when the dismissal order incorporates the settlement terms, or the court has retained jurisdiction over the settlement contract" and a party alleges a violation of the settlement. *Id.* Under those circumstances, a breach of the agreement is a violation of the court's order, and the court has jurisdiction to enforce the agreement. *Kokkonen*, 511 U.S. at 381. Because the Court's order in this case incorporated the terms of the Settlement and retained jurisdiction (Doc. 45), the Court has jurisdiction to hear Plaintiff's motion.

## II. Legal Standard.

In Arizona, "settlement agreements, including determinations as to the validity and scope of release terms, are governed by general contract principles." *Emmons v. Sup. Ct. in & for Cty. of Maricopa*, 968 P.2d 582, 585 (Ariz. Ct. App. 1998); *Knudsen v. C.I.R.*, 793 F.3d 1030, 1035 (9th Cir. 2015); *see Adams v. Johns-Manville Corp.*, 876 F.2d 702, 709 (9th Cir. 1989) (a motion to enforce a settlement agreement is essentially "an action to specifically enforce a contract"). The party seeking to enforce the agreement bears the burden of proving breach. *See In re Andreyev*, 313 B.R. 302, 305 (B.A.P. 9th Cir. 2004). "[I]nterpretation of a contract is generally a matter of law," *Powell v. Washburn*, 125 P.3d 373, 375 (Ariz. 2006), but whether a party has breached is a question for the trier of fact, *see Walter v. F.J. Simmons*, 818 P.2d 214, 218-19 (Ariz. Ct. App. 1991); *Shiloh Custom Homes, Inc. v. Drywall*, No. 1 CA-CV 07-0677, 2009 WL 690600, at *7 (Ariz. Ct. App. March 17, 2009). A party breaches a contract when it "fail[s], without legal excuse, to perform any promise which forms the whole or part of a contract." *Snow v. Western Sav. & Loan Ass'n*, 730 P.2d 204, 210 (Ariz. 1986).

Plaintiff seems to view the Settlement as tantamount to a court decree entered after a finding that the prison system violated constitutional rights. Among other relief, Plaintiff asks the Court to "[a]ppoint an independent monitor to ensure Defendant's future compliance with the terms of the settlement agreement." Doc. 64 at 18. But the Court entered no decree after finding constitutional violations by Defendant. The Court's task, therefore, is not to bring the prison system into conformity with a constitutional decree and

make broad determinations about what may or may not satisfy equal protection principles. The Court's task is to enforce a contract negotiated between the parties with the advice of their lawyers. Breach of the Settlement may empower the Court to enforce the contract as written, but it does not grant the Court license to impose conditions that were not specifically agreed to by the parties, nor the power to roam broadly through the close-custody operation seeking to apply equal protection principles. The Court will review the Settlement as a contract.

**III. Discussion.**

Plaintiff asserts two breaches of the Settlement: Defendant has failed to (1) provide conditions and restrictions of confinement, and quality of facilities for death-sentenced inmates, that are equivalent to existing close-custody facilities, and (2) permit all death-sentenced inmates to seek and obtain reclassification of their custody status. Doc. 64 at 5. Defendant argues that Plaintiff failed to exhaust administrative remedies and lacks standing, and that Plaintiff cannot establish breach of the Settlement.

**A. Exhaustion.**

Defendant asserts that Plaintiff was required to exhaust administrative remedies under 42 U.S.C. § 1997e(a) before filing this motion. Doc. 66 at 3. Even if exhaustion is not required, Defendant argues that it would be "manifestly unfair" for Plaintiff to "evade the grievance procedure and begin litigation out of nowhere." *Id.* But Plaintiff has not initiated a new lawsuit. He seeks to enforce the parties' Settlement, the terms of which were incorporated into the Court's dismissal order. *See* Doc. 45; *Kokkonen*, 511 U.S. at 378; *Alvarado*, 508 F.3d at 1017. Section 1997e(a) requires prisoners to exhaust administrative remedies before filing a § 1983 suit, but Plaintiff has not filed a new suit.

**B. Standing.**

Defendant suggests that Plaintiff has not shown any personal injury from the alleged breaches of the Settlement and that he therefore lacks standing to sue on behalf of other inmates. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (requiring an injury-in-fact for Article III standing). But again, Plaintiff has not filed a new lawsuit. He seeks

to enforce a remedy he obtained in this case. Plaintiff has had standing from the outset of this case, Defendants have never challenged his standing in this case, and Defendants cite no authority to suggest that he must establish standing anew to enforce the remedy he received in this case.

### C. Inferior Conditions for Death-Sentenced Inmates.

Plaintiff asserts that six conditions at Central Unit are inferior for death-sentenced inmates: safety, employment opportunities, visitation, telephone privileges, purchasing property, and recreation. Doc. 64 at 6-15. The Court will address each of these conditions, keeping in mind that it is being asked to enforce a contract, not a broad set of statutory or constitutional rights.

### 1. Safety.

Plaintiff argues that Defendant breached the Settlement by housing and facilitating recreation of all death-sentenced inmates together, including those with sex-offense or other "repugnant" convictions. Doc. 64 at 6-8. He alleges that this arrangement creates an unsafe environment for death-sentenced inmates in close custody. *Id.* at 6. Plaintiff cites the ADOC regulations for non-death-sentenced inmates which state that classified sex offenders are placed in a separate sex offender unit. Doc. 64-2 at 4. The regulations further provide that ADOC should consider whether an inmate has been convicted of a "crime repugnant to the inmate population resulting in threats, verbal abuse, or harassment" when reviewing his petition for protective custody. *Id.* at 17. Plaintiff argues that these regulations and safety concerns apply to death-sentenced close-custody inmates. Docs. 64 at 6-8; 69 at 5.

But Plaintiff points to no provision in the Settlement that requires sex offenders and others to be housed separately from other death-sentenced inmates placed in close custody. And as Defendant notes, the Settlement provides that death-sentenced inmates in close custody "may be housed as a group, rather than with non-death sentenced inmates, provided however that nothing [] shall alter existing protocols and procedures relating to protective custody assignments." Doc. 39 at 2 ¶ 2. Because Plaintiff has identified no part

of the Settlement that is breached by the current housing arrangement, he has not met his burden to prove Defendant's breach. *See In re Andreyev*, 313 B.R. at 305.

### 2. Employment Opportunities.

Plaintiff asserts that death-sentenced inmates have fewer work opportunities than other close-custody inmates at Central Unit and "only have access to jobs which are segregated from the general population." Docs. 64 at 8; 69 at 7. Plaintiff contends that he has been unable to perform tasks related to his job as a chaplain's assistant, and attributes the job disparity for death-sentenced inmates to safety concerns and restricted mobility created by Defendant's housing of all death-sentenced inmates together. Doc. 64 at 8.

It is not clear that Plaintiff can assert a breach of the Settlement based on how other death-sentenced inmates are treated by Defendant. Plaintiff did not bring this case as a class action, and the Settlement was only between Plaintiff and Defendant. Doc. 39.

But even if Plaintiff could assert a breach based on the treatment of others, he presents no evidence that Defendant is disproportionately denying job opportunities to death-sentenced inmates in close custody. Defendant cites evidence that 59 out of 82 death-sentenced inmates, or 69%, have jobs, compared to 40% of the 721 non-death-sentenced inmates with jobs at Central Unit. Doc. 66-1 at 3-4.

Plaintiff claims that he is being unduly restricted from performing his job, but provides no evidence to support this assertion. Doc. 64 at 9. Defendant, on the other hand, provides evidence that Plaintiff can and does travel outside his housing unit for his job, but only when the chaplain is present, a condition no different than for other close-custody inmates. Doc. 66-1, ¶ 8. Plaintiff has not met his burden to prove Defendant's breach.

### 3. Visitation.

Plaintiff asserts that death-sentenced inmates are denied visitation time. Doc. 64 at 10.[1] He cites ADOC regulations that allow between one and three visitation blocks per

---

[1] Plaintiff seems unsure about whether death-sentenced inmates in close custody are entitled to contact visits, citing regulations supporting that they are. Doc. 64 at 9-10. Defendant asserts that all close-custody inmates at Central Unit, including death-sentenced inmates, receive contact visits. Doc. 66 at 7 (citing Doc. 66-1 at 4).

- 6 -

week according to whether the inmate is classified as Phase I, II, or III, respectively. *Id.*; Doc. 64-2 at 24. Based on these regulations and Central Unit's June to September 2018 visitation schedules, Plaintiff concludes that "death sentenced inmates . . . are regularly denied the three weekly visitation blocks they are entitled to." Doc. 64 at 10. Plaintiff asserts that this is due in part to limited space, and implies that the Settlement requires Defendant to construct "new facilities greatly expanding the space available for visitation." Doc. 64 at 11. Defendant concedes that visitation space is limited (Doc. 66-1 at 4), but no term of the Settlement requires Defendant to house death-sentenced inmates in a newly constructed facility, to build additional visitation space, or to provide specific visitation hours to all inmates (Doc. 39).

Significantly, Plaintiff does not assert that he has been denied any visitation time required under the Settlement. Nor does he cite any portion of the Settlement that addresses visitation. The Settlement requires Defendant to "provide adequate space for confidential communication with legal counsel," but makes no other specific reference to visitation. Doc. 39 at 2. Plaintiff does not assert a breach of the counsel-related provision. Doc. 64.

Plaintiff does argue that death-sentenced inmates generally are denied visitation time, but, as noted above, the Settlement was between Plaintiff and Defendant. It is not clear he can assert a breach based on Defendant's treatment of some other inmates. And even if he could, Plaintiff has not shown that other death-sentenced inmates in close custody are disproportionately denied visitation. He asserts that Phase III close-custody inmates receive three visitation blocks per week, and he cites general visitation statistics to show that three blocks are not being granted to death-sentenced inmates, but he cites no evidence that all death-sentenced inmates are in Phase III. Doc. 64.

What is more, the evidence shows that from June to September 2018, death-sentenced inmates received the same number of visitation blocks as the non-death-sentenced inmates at Central Unit, if not more. In June, all cell blocks received eight four-hour visitation blocks. Doc. 64-2 at 26. In July, death-sentenced inmates, who are housed in Cell Block 5/4A, received ten four-hour visitation blocks, whereas two non-

death-sentenced cell blocks received eight. *Id.* at 27. In August, Phase I and II death-sentenced inmates had six four-hour blocks, with another day of visitation for Phase III inmates – the same number as all other cell blocks, save one. *Id.* at 28. And in September, death-sentenced inmates received ten four-hour visitation blocks, more than all other cell blocks received, save one. *Id.* at 29. Defendant also provides evidence that death-sentenced inmates "typically do not use all of their weekly visitation time." Doc. 66-1, ¶ 9.

Plaintiff fails to meet his burden to establish Defendant's breach.

### 4. Telephone Privileges.

Plaintiff claims that Defendant has not provided death-sentenced inmates with the same telephone privileged as other close-custody inmates. Doc. 64 at 11-12. But Plaintiff does not assert that he has been denied any telephone time required under the Settlement. He does cite one grievance appeal response, but it concerns another inmate. Doc. 64-2 at 66. Nor does Plaintiff cite any portion of the Settlement that addresses telephone time.

Plaintiff discusses the phone privileges of Central Unit inmates in general. Doc. 64 at 11-12. ADOC regulations allow a close-custody inmate to make one, two, or four 15-minute phone calls per day, depending on whether he is Phase I, II, or III, respectively. Doc. 64-2 at 32, 37-38. Plaintiff contends that death-sentenced inmates at Central Unit are only allowed three phone calls per week. Doc. 64 at 11 (citing Doc. 64-2 at 37).

Defendant asserts that Plaintiff assumes mistakenly that the "death row" regulations apply to death-sentenced inmates in close custody. Defendant concedes that the appeal response for another inmate cited by Plaintiff "incorrectly reproduce[ed] the unused 'Death Row' regulations," but asserts that the cited regulation is inapplicable to death-sentenced inmates who have been moved to close custody. Doc. 66 at 9 n.4. Defendant further contends that while some "stray regulations" may still refer to death row inmates, death-sentenced inmates in close custody are "considered [] close-custody inmates in respect to privileges . . . and treated like any other close-custody inmate." Docs. 66 at 9; 66-1 at 4, 9-10. Other than the appeal response, Plaintiff cites no evidence that Defendant is failing to provide equivalent phone privileges to death-sentenced inmates.

Plaintiff also asserts that "[e]ven if the regulations did not discriminate against close custody death row," Central Unit is unequipped with enough telephones to accommodate the daily calls that death-sentenced inmates are entitled to place. Doc. 64 at 11-12. But Plaintiff cites no evidence of the number of death-sentenced inmates in each phase level, how many operable telephones exist and how often they are available, or whether a death-sentenced inmate has been denied telephone access.

Finally, the Settlement does not require death-sentenced inmates in close custody to have specific phone privileges – it requires only equivalent privileges and conditions between death-sentenced and non-death-sentenced inmates in close custody. Plaintiff cites no evidence of disparate treatment.

Plaintiff fails to meet his burden to show Defendant's breach.

### 5. Purchasing Property.

Plaintiff asserts that death-sentenced inmates are unable to purchase tobacco products and bed sheets at Central Unit, but cites no supporting evidence. Doc. 64 at 12-13. Plaintiff does not assert that he has been denied any purchases. Nor does he cite any portion of the Settlement that addresses commissary privileges.

Defendant notes that tobacco products are not permitted at Central Unit for any inmates, although tobacco products are permitted at other prison locations. Doc. 66-1 at 5. Defendant also asserts that death-sentenced inmates may purchase sheets like other inmates. Doc. 66-1 at 5.

The prohibition of tobacco products at Central Unit does not violate the Settlement because it applies to both death-sentenced and non-death-sentenced inmates in close custody. The parties did not agree that Defendant would establish equivalent conditions and facilities between *all* close-custody facilities, nor that Defendant would standardize all facilities to have exactly the same "close custody conditions" as Plaintiff suggests. Doc. 69 at 4. The Settlement requires only that conditions and quality of facilities for death-sentenced inmates be "equivalent to that of *existing* close-custody housing facilities used for non-death sentenced inmates." Doc. 39 at 2 (emphasis added). Central Unit is an

existing close-custody facility, and it does not permit tobacco products. Death-sentenced and non-death-sentenced inmates are given same purchasing privileges in that facility.

Plaintiff fails to meet his burden to establish Defendant's breach.

### 6. Recreation.

Plaintiff argues that death-sentenced inmates regularly receive only one to four hours of the six outdoor recreation hours they are entitled to, sometimes with no recreation in a week. Doc. 64 at 13; *see also* Doc. 64-2 at 54. He cites no supporting evidence, nor does he argue that death-sentenced inmates receive less recreation time than other close-custody inmates at Central Unit.

Plaintiff also asserts that in January 2018, death-sentenced inmates began spending their outdoor recreation time on the smaller of two outdoor yards at Central Unit. Doc. 64 at 14. Plaintiff details how this second yard is inferior, but cites no supporting evidence. *Id.* Defendant responds that as of January 2018, all close-custody inmates at Central Unit spend recreation hours on the second, smaller yard, because personnel issues prevent staffing the larger yard. Docs. 66 at 10; 66-1 at 5. Defendant also asserts that no reduction in recreation hours has occurred, but if it had, it would have applied to all close-custody inmates, not solely to death-sentenced inmates. Doc. 66 at 10.

Plaintiff cites no evidence showing unequal recreation hours or quality of facilities between death-sentenced and non-death-sentenced inmates at Central Unit. And no Settlement term requires that death-sentenced inmates receive a certain number of recreation hours or a certain quality of facilities, only that they have be equivalent to existing close-custody facilities.

Plaintiff fails to meet his burden to establish Defendant's breach.

### D. Opportunity to Seek Reclassification.

Plaintiff argues that Defendant has failed to permit death row inmates to seek and obtain reclassification. Doc. 64 at 15-19. He does not assert that he has been denied reclassification. And, as noted above, it is not clear that Plaintiff can claim breach of his

Settlement on behalf of other inmates. The Court need not resolve this issue, however, because Plaintiff has not presented evidence to support his claim.

### 1. Arbitrary Placement in Maximum Custody.

Plaintiff asserts that in "multiple instances" Defendant is keeping death-sentenced inmates in maximum custody despite their eligibility for close custody. Doc. 64 at 16. He also asserts that some reclassified death-sentenced inmates were moved back to maximum custody after disciplinary infractions without receiving procedural hearings and protections under ADOC's regulations. *Id.* Plaintiff cites no evidence supporting any of these allegations.

Defendant provides evidence that no classification is done based solely on an inmate's death sentence, that inmates receive the required hearings prior to reclassification, and that, if a death-sentenced inmate remains in or is removed to maximum security, it likely is because of ineligibility due to behavioral issues. Doc. 66-1 at 5, 10.

### 2. Security Threat Group Step-Down.

Plaintiff argues that Defendant is denying death-sentenced inmates who are validated members of a security threat group ("STG") the opportunity to complete a 24-month "step-down" program, which would allow STG inmates to obtain reclassification from maximum security to close custody. Doc. 64 at 17-19. Plaintiff cites no supporting evidence, nor does he argue that any STG inmates have been denied requested admission to the step-down program.[2]

Defendant responds that an inmate must have no improper behavior for 24 months to be eligible for admission to the step-down program. Docs. 66 at 12; 64-2 at 57. Improper behavior includes documented participation in STG or gang activity, and other incidents including assault, threats, and violations of other prison policies. Doc. 64-2 at 57. Defendant notes that only two death-sentenced inmates are validated STG inmates, and

---

[2] Defendant's response states that an STG inmate could obtain reclassification by renouncing his gang membership and debriefing. Doc. 66 at 11. Plaintiff's reply argues that renunciation is not an equivalent method for reclassification. Doc. 60 at 8. But Plaintiff has not shown, and Defendant did not concede, that STG inmates are prevented from participation in the step-down program because of their death-sentence.

- 11 -

neither is currently eligible for reclassification to close custody or participation in the step-down program. Doc. 66-1 at 10. Plaintiff cites no evidence to the contrary.

## V. Conclusion.

Plaintiff has failed to show that Defendant has breached the Settlement. The Court will deny Plaintiff's motion.

**IT IS ORDERED** that Plaintiff's motion to enforce (Doc. 64) is **denied**.

Dated this 11th day of February, 2019.

*David G. Campbell*

David G. Campbell
Senior United States District Judge