WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Scott Douglas Nordstrom, | CV15-02176-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Charles L. Ryan, Director of the Arizona Department of Corrections; James O'Neil Warden, ASPC Eyman; and Staci Fay, Deputy Warden, Browning Unit, | |
| Defendants. | |

Before the Court are motions to enforce a settlement agreement between Plaintiff Scott Nordstrom and Defendants Arizona Department of Corrections ("ADOC") and others, filed by seven death-sentenced inmates: Charles Rienhardt, Ernesto Martinez, Todd Smith, Tracy Alan Hampton, Ruben Garza, Pete VanWinkle, and Manuel Ovante Jr. ("the Inmates"). Docs 71, 75, 76, 80, 81, 85, 86. Some of the Inmates have filed other motions: motions for extensions of time to file reply briefs (Docs. 98, 99, 100, 101), motions to desist hindering third party beneficiary's ability to file (Docs. 87, 88), and a motion for default judgment (Doc. 96). Oral argument has not been requested. For the following reasons, the Court will deny the motions.

**I.    Background.**

In October 2015, Plaintiff, a death-sentenced inmate in state custody, brought an action against Defendants for violations of the Eighth and Fourteenth Amendments related

to death row conditions. Doc. 1. Having already planned to make death row inmates eligible for reclassification to close-custody housing, ADOC settled with Plaintiff on March 3, 2017 ("the Settlement"). Doc. 39. The Settlement provided:

> [ADOC will] eliminate the existing permanent classification of inmates with a death sentence to maximum custody units, and [] permit death row inmates to seek and obtain re-classification to close custody status based on the criteria currently available to non-death sentenced maximum custody inmates[;]
>
> Death sentenced inmates who are re-classified to close custody status may be housed as a group, rather than with non-death sentenced inmates, provided, however, that nothing herein shall alter existing protocols and procedures relating to protective custody assignments.
>
> [The] conditions and restrictions of confinement, and quality of facilities, utilized for close custody housing for death sentenced inmates shall be equivalent to that of existing close custody housing facilities used for non-death sentenced inmates.
>
> [***]
>
> Plaintiff's current disciplinary record meets the criteria for reclassification to close custody and he shall be reclassified to such status and transferred to such housing upon adoption of the above referenced amendments, and within one hundred twenty (120) days of this stipulations. Nothing in this stipulation shall be interpreted to require Plaintiff to remain classified as a close custody inmate if he no longer meets the requirements for close custody classification.

*Id.* at 2 ¶¶ 1-3, 6. Based on this settlement between Mr. Nordstrom and Defendants, the Court dismissed Mr. Nordstrom's action, incorporated the Settlement terms in its order, and retained jurisdiction to enforce the agreement. Doc. 45.

In September 2018, Plaintiff filed a motion to enforce the settlement agreement, asserting that Defendants failed to provide "'conditions and restrictions of confinement, and quality of facilities' that are 'equivalent to that of existing close custody housing facilities used for non-death sentenced inmates.'" Doc. 60 at 5. The Court denied Plaintiff's motion. Doc. 72. Among other holdings, the Court noted that Mr. Nordstrom,

as Plaintiff, "did not bring this case as a class action, and the Settlement was only between Plaintiff and Defendant." *Id.* at 6.

The seven motions before the Court similarly assert that Defendants have breached the settlement agreement by failing to provide re-classification criteria that are currently available to non-death-sentenced, maximum-custody inmates.

## II. Jurisdiction.

"In general, '[e]nforcement of [a] settlement agreement . . . whether through award of damages or decree of specific performance, is more than just a continuation or renewal of the dismissed suit, and hence requires its own basis for jurisdiction.'" *Alvarado v. Table Mountain Racheria*, 508 F.3d 1008, 1017 (9th Cir. 2007) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994)). But "a federal court has jurisdiction to enforce a settlement agreement in a dismissed case when the dismissal order incorporates the settlement terms, or the court has retained jurisdiction over the settlement contract" and a party alleges a violation of the settlement. *Id.* Under those circumstances, a breach of the agreement is a violation of the court's order, and the court has jurisdiction to enforce the agreement. *Kokkonen*, 511 U.S. at 381. Because the Court's order in this case incorporated the terms of the Settlement and retained jurisdiction (Doc. 45), the Court has jurisdiction to hear the motions. Where an order grants relief to a nonparty, the Court may enforce the order using the same procedures available to a party. *See* Fed. R. Civ. P. 71.

## III. Legal Standard.

In Arizona, "settlement agreements, including determinations as to the validity and scope of release terms, are governed by general contract principles." *Emmons v. Sup. Ct. in & for Cty. of Maricopa*, 968 P.2d 582, 585 (Ariz. Ct. App. 1998); *Knudsen v. C.I.R.*, 793 F.3d 1030, 1035 (9th Cir. 2015); *see Adams v. Johns-Manville Corp.*, 876 F.2d 702, 709 (9th Cir. 1989) (a motion to enforce a settlement agreement is essentially "an action to specifically enforce a contract"). Interpretation of a contract is generally a matter of law, *see Powell v. Washburn*, 125 P.3d 373, 375 (Ariz. 2006), but whether a party has breached

the contract is a question for the trier of fact, *see Walter v. F.J. Simmons*, 818 P.2d 214, 218-19 (Ariz. Ct. App. 1991).

**IV.     Discussion.**

    **A.     Standing.**

Defendants argue that the Inmates lack standing because the Settlement was not made in their favor. Doc. 89 at 2. All seven Inmates assert standing under Rule 71 and the Ninth Circuit's decision in *Hook v. Ariz. Dep't of Corr.*, 972 F.2d 1012, 1014 (9th Cir. 1992). Docs. 71, 75, 76, 80, 81, 85, 86.

Rule 71 provides: "When an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party." This is a procedural rule; it specifies the procedure for enforcing court orders in favor of persons who are "properly affected by them, even if they are not parties to the action." *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323 (9th Cir. 1998). Rule 71 does not grant standing to a nonparty absent a showing of intended third-party-beneficiary status. *See Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 287 (D.C. Cir. 1993) ("The courts that have allowed non-parties to sue to enforce a consent decree or other court order as intended third party beneficiaries have relied in large part on Rule 71.").[1]

In *Hook*, the Ninth Circuit found Rule 71 consistent with contract principles that allow an intended third-party beneficiary to enforce an agreement. 972 F.2d 1012. In that case, prison inmates filed a suit alleging constitutional violations related to ADOC's mail policies. *Id.* at 1013. To resolve the dispute, ADOC developed a comprehensive mail regulation scheme that was accepted by the inmates and the court. *Id.* Nine years later, ADOC sought to change the scheme, contrary to the consent decree, and 265 new inmate plaintiffs filed suit to enforce the original consent decree. *Id.*

The Ninth Circuit held that the inmates had standing as third-party beneficiaries even though none of them was an original party. *Id.* at 1015. *Hook* distinguished a U.S.

---

[1] Even if Rule 71 could be read to provide some independent basis for standing, the Inmates would not qualify. For reasons explained below, they are not persons to whom the Settlement "grants relief." Fed. R. Civ. P. 71.

- 4 -

Supreme Court case, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975), which held that incidental third-party beneficiaries could not sue to enforce a consent decree. *Id*. The defendant in *Hook* argued that *Blue Chip* applied to all third parties seeking to enforce a contract. *Id*. The Ninth Circuit found that *Blue Chip* was limited to cases where the U.S. Government is the plaintiff because third-party beneficiaries to the government's contract rights are usually assumed to be only incidental beneficiaries, precluding them from enforcing the contract "absent a clear expression of a different intent." *Id*. (citing Restatement (Second) of Contracts § 313(2) cmt. a). *Hook* did not define who qualifies as an intended third-party beneficiary because the defendants in that case did not dispute that the plaintiffs were intended third-party beneficiaries. *Id*.

In Arizona, for a person to recover as a third-party beneficiary of a contract, the intent to benefit the person must be found in the contract itself. *Norton v. First Fed. Savings*, 624 P.2d 854, 856 (1981) (citing *Irwin v. Murphey*, 302 P.2d 534 (1956)). The contemplated benefit must be both intentional and direct. *Id*. It is not enough that a contract may operate to a person's benefit – it "must appear that the parties intended to recognize the [person] as the *primary* party in interest and as privy to the promise." *Sherman v. First Am. Title Ins.*, 38 P.3d 1229, 1232 (Ariz. Ct. App. 2002) (citation omitted) (emphasis in original); *Tanner Cos. v. Ins. Mktg. Servs., Inc.*, 743 P.2d 951, 953 (Ariz. Ct. App. 1987) (stating a party may not recover as a third party beneficiary "if it is merely an incidental beneficiary . . . rather than one for whose express benefit the [contract] was made"). Whether a person is an incidental or direct beneficiary is a question of contract construction for the Court. *Maganas v. Northroup*, 663 P.2d 565, 567 (1983).

The Court cannot conclude that the parties to the Settlement intended to recognize the Inmates as the primary parties in interest and as privy to the Settlement. *Sherman*, 38 P.3d at 1232. Mr. Nordstrom did not bring this case as a class action, nor did he purport to sue on behalf of any of the Inmates. Further, the Court did not enter a consent decree after finding broad constitutional or statutory violations. Instead, the Court simply accepted a settlement negotiated between the parties to this case.

The Settlement specifically provides relief for Mr. Nordstrom, who clearly was the primary party in interest and recipient of the Settlement guarantee. *Basurto v. Utah Const. & Mining Co.*, 485 P.2d 859, 863 (Ariz. Ct. App. 1971). While the Inmates received a benefit from the change to Defendants' policies, they are incidental beneficiaries, not primary parties in interest and privy to the Settlement. Thus, the Inmates do not have standing to enforce the Settlement.

### B. The Inmates' Motions.

Even if the Court found that the Inmates had standing, their alleged claims are outside the scope of the Settlement or moot. The Court will address each of the Inmates' motions, keeping in mind that it is being asked to enforce a contract, not a broad set of statutory or constitutional rights. Nothing in this order should be construed as ruling on the merits of the Inmates' allegations of unequal treatment or due process violations – those claims, if viable, must be asserted in separate lawsuits.

### 1. Charles B. Rienhardt.

After Mr. Rienhardt was reclassed to close custody, he was moved to the Browning Unit (a super max disciplinary unit) following a fight in the dining hall. Doc. 71 at 2. He asserts that his due process rights were violated because he was not afforded a disciplinary proceeding prior to his removal from close custody. Doc. 74 at 3. He alleges that this was due to his death-sentence status because fist fights happen all of the time but do not result in the removal or reclassification of a prisoner. *Id.* at 2. He claims that he is not being afforded a reclassification system that uses criteria currently available to non-death-sentenced inmates. *Id.* at 4.

These allegations are not covered by the Settlement. Mr. Rienhardt alleges unequal treatment in disciplinary procedures due to his death-sentence status. The Settlement does not address disciplinary procedures for death-sentenced inmates following reclassification.

Mr. Rienhardt also argues that death-sentenced inmates are not receiving the same classification criteria because sex-offender, death-sentenced inmates are housed with non-sex-offender, death-sentenced inmates. Doc. 74 at 4. This is not a breach of the Settlement.

As stated in the Court's previous order, there is no provision in the Settlement that requires sex offenders and others to be housed separately from other death-sentenced inmates placed in close custody. Doc. 72 at 5. In fact, the Settlement provides that death-sentenced inmates in close custody "may be housed as a group, rather than with non-death sentenced inmates, provided however that nothing [] shall alter existing protocols and procedures relating to protective custody assignments." Doc. 39 ¶ 2.

### 2. Ernesto S. Martinez.

Mr. Martinez asserts that he has been denied the ability to reclassify to close custody based on the same criteria as other non-death-sentenced, max-custody inmates. Doc. 75 at 3. Mr. Martinez has been validated as a member of a security threat group ("STG"). *Id.* at 4. STG-validated inmates can be housed in close custody if they complete a 24-month step-down program or renounce their gang affiliation. Doc. 75 at 3-4. According to Mr. Martinez, he requested to enroll in the 24-month program but was told he could not due to his death-sentenced status. *See* Doc. 75 at 4, 15.

Defendant concedes that Mr. Martinez was erroneously informed that as a death-sentenced inmate he did not qualify for the step-down program. Doc. 89 at 6. Defendant submits an affidavit stating that a STG-validated, death-sentenced inmate can complete the program, but Mr. Martinez does not qualify because he has not completed 24 months with no participation in documented STG or gang activity or other listed behaviors. *See* Doc. 89-1 ¶ 18. Mr. Martinez's eligibility for the step-down program is outside the scope of the Settlement.

### 3. Ruben J. Garza.

Mr. Garza is in the Browning unit after a disciplinary violation following his reclassification to close custody. Doc. 86 at 2. He completed programming and received a high reclassification level. *Id.* at 3. Mr. Garza contends that he has not been reclassified out of Browning because of his death-sentenced status. *Id.* As noted, the Settlement does not address disciplinary procedures for death-sentenced inmates following reclassification to close custody. Mr. Garza's claim that ADOC violated the Settlement by not separating

As stated in the Court's previous order, there is no provision in the Settlement that requires sex offenders and others to be housed separately from other death-sentenced inmates placed in close custody. Doc. 72 at 5. In fact, the Settlement provides that death-sentenced inmates in close custody "may be housed as a group, rather than with non-death sentenced inmates, provided however that nothing [] shall alter existing protocols and procedures relating to protective custody assignments." Doc. 39 ¶ 2.

### 2. Ernesto S. Martinez.

Mr. Martinez asserts that he has been denied the ability to reclassify to close custody based on the same criteria as other non-death-sentenced, max-custody inmates. Doc. 75 at 3. Mr. Martinez has been validated as a member of a security threat group ("STG"). *Id.* at 4. STG-validated inmates can be housed in close custody if they complete a 24-month step-down program or renounce their gang affiliation. Doc. 75 at 3-4. According to Mr. Martinez, he requested to enroll in the 24-month program but was told he could not due to his death-sentenced status. *See* Doc. 75 at 4, 15.

Defendant concedes that Mr. Martinez was erroneously informed that as a death-sentenced inmate he did not qualify for the step-down program. Doc. 89 at 6. Defendant submits an affidavit stating that a STG-validated, death-sentenced inmate can complete the program, but Mr. Martinez does not qualify because he has not completed 24 months with no participation in documented STG or gang activity or other listed behaviors. *See* Doc. 89-1 ¶ 18. Mr. Martinez's eligibility for the step-down program is outside the scope of the Settlement.

### 3. Ruben J. Garza.

Mr. Garza is in the Browning unit after a disciplinary violation following his reclassification to close custody. Doc. 86 at 2. He completed programming and received a high reclassification level. *Id.* at 3. Mr. Garza contends that he has not been reclassified out of Browning because of his death-sentenced status. *Id.* As noted, the Settlement does not address disciplinary procedures for death-sentenced inmates following reclassification to close custody. Mr. Garza's claim that ADOC violated the Settlement by not separating

As stated in the Court's previous order, there is no provision in the Settlement that requires sex offenders and others to be housed separately from other death-sentenced inmates placed in close custody. Doc. 72 at 5. In fact, the Settlement provides that death-sentenced inmates in close custody "may be housed as a group, rather than with non-death sentenced inmates, provided however that nothing [] shall alter existing protocols and procedures relating to protective custody assignments." Doc. 39 ¶ 2.

### 2. Ernesto S. Martinez.

Mr. Martinez asserts that he has been denied the ability to reclassify to close custody based on the same criteria as other non-death-sentenced, max-custody inmates. Doc. 75 at 3. Mr. Martinez has been validated as a member of a security threat group ("STG"). *Id.* at 4. STG-validated inmates can be housed in close custody if they complete a 24-month step-down program or renounce their gang affiliation. Doc. 75 at 3-4. According to Mr. Martinez, he requested to enroll in the 24-month program but was told he could not due to his death-sentenced status. *See* Doc. 75 at 4, 15.

Defendant concedes that Mr. Martinez was erroneously informed that as a death-sentenced inmate he did not qualify for the step-down program. Doc. 89 at 6. Defendant submits an affidavit stating that a STG-validated, death-sentenced inmate can complete the program, but Mr. Martinez does not qualify because he has not completed 24 months with no participation in documented STG or gang activity or other listed behaviors. *See* Doc. 89-1 ¶ 18. Mr. Martinez's eligibility for the step-down program is outside the scope of the Settlement.

### 3. Ruben J. Garza.

Mr. Garza is in the Browning unit after a disciplinary violation following his reclassification to close custody. Doc. 86 at 2. He completed programming and received a high reclassification level. *Id.* at 3. Mr. Garza contends that he has not been reclassified out of Browning because of his death-sentenced status. *Id.* As noted, the Settlement does not address disciplinary procedures for death-sentenced inmates following reclassification to close custody. Mr. Garza's claim that ADOC violated the Settlement by not separating

death-sentenced inmates based on sex-offender status (Doc. 86 at 3-4) is also denied for reasons explained above. *See* Docs. 39 ¶ 2, 72 at 5.

### 4. Tracy Alan Hampton.

Mr. Hampton is in Browning after a disciplinary violation in close custody. Doc. 80 at 2. He alleges that he has had good behavior for three years and has completed numerous programming courses, but has not been reclassified. *Id*. As discussed above, these claims are not covered by the Settlement agreement.

### 5. Manuel Ovante Jr.

Mr. Ovante is in Browning after a disciplinary violation in close custody. Doc. 85 at 2. He too alleges good behavior, completion of programming, and achievement of a high rating for good behavior. *Id*. Because his claims relate to disciplinary proceedings following reclassification to close custody, they are not covered by the Settlement.

### 6. Todd Smith.

Mr. Smith is in Browning after a disciplinary violation following reclassification to close custody. Doc. 81 at 2. He alleges that he has had no disciplinary violations and completed numerous programming courses, resulting in a high reclassification status. *Id*. As discussed above, his claims are not covered by the Settlement.

### 7. Pete VanWinkle.

Mr. VanWinkle is an STG-validated inmate. Doc. 76 at 2. He asserts that he is being denied access to the step-down program because of his death-sentenced status. Doc. 76 at 2. Mr. VanWinkle submitted copies of his inmate letter requesting enrollment in the step-down program, in which he was informed that he was not eligible for step down due to his death sentence. Doc. 76 at 5. But in his next level informal complaint response, Mr. VanWinkle was informed that death-sentenced inmates will be permitted to enroll in the step-down program, but he does not qualify. Doc. 76 at 7-8, 10. His claim does not implicate the Settlement.

///

///

**V.  Conclusion.**

The Inmates do not have standing as intended third-party beneficiaries to enforce the Settlement. And even if they had standing, none of their claims falls under the terms of the Settlement. The Court will dismiss the Inmates' motions to enforce the Settlement. Because none of the claims can be cured by further argument, the Court will also dismiss all other pending motions as moot.

**IT IS ORDERED:**

1. The motions to enforce the settlement (Docs. 71, 75, 76, 79, 80, 81, 85, 86) are **denied**.
2. The motions to cease and desist hindering third-party beneficiary's ability to file and serve plaintiff and defendant (Docs. 87, 88) are **denied**.
3. The motions for an extension of time to file a reply (Docs. 98, 99, 100, 101) are **denied**.
4. The motion for default judgment (Doc. 96) is **denied**.

Dated this 15th day of May, 2019.

David G. Campbell
Senior United States District Judge